TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

ANDRENE E. DABAGHI
GENEVIEVE S. PARSHALLE
Environmental Enforcement Section
United States Department of Justice
150 M Street NE
Washington, D.C. 20002
(202) 598-9576
Andrene.Dabaghi@usdoj.gov

VANESSA R. WALDREF
United States Attorney
Eastern District of Washington

DEREK T. TAYLOR
Assistant United States Attorney
920 West Riverside Avenue, Suite 340
Spokane, WA 99201
(509) 835-6319
Derek.Taylor@usdoj.gov

*Attorneys for Plaintiff United States of America*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COW PALACE, LLC; THE DOLSEN COMPANIES; THREE D PROPERTIES, LLC; GEORGE & | Civil No. 24-cv-3092<br><br>COMPLAINT |

MARGARET, L.L.C.; GEORGE DERUYTER AND SON DAIRY, L.L.C.; D AND J DAIRY, L.L.C. (f/k/a D AND A DAIRY, L.L.C.); LIBERTY DAIRY, LLC; ARIZONA ACRES LIMITED PARTNERSHIP; LIBERTY ACRES LLC; BOSMA DAIRY PARTNERS, LLC; BOSMA ENTERPRISES, INC.; HENRY BOSMA; HENRIETTA BOSMA; and KATHLEEN NICOLAUS,

Defendants.

The United States of America ("United States"), by the authority of the Attorney General of the United States, on behalf of the United States Environmental Protection Agency ("EPA"), alleges as follows:

## NATURE OF ACTION

1. This civil action seeks to address ongoing nitrate contamination of groundwater from dairy operations in the Lower Yakima Valley of south-central Washington State. This groundwater supplies drinking water for private wells and public water systems and is used daily by residents of the Lower Yakima Valley—including babies and adults with underlying health conditions—for whom overconsumption of nitrate poses risks to health and life.

2. The United States brings this civil action pursuant to Section 1431 of the Safe Drinking Water Act ("SDWA" or "the Act"), 42 U.S.C. § 300i, for

injunctive relief and civil penalties against Cow Palace, LLC; the Dolsen Companies; Three D Properties, LLC; George & Margaret, L.L.C.; George DeRuyter and Son Dairy, L.L.C., D and J Dairy, L.L.C. (f/k/a D and A Dairy, L.L.C.); Liberty Dairy, LLC; Arizona Acres Limited Partnership; Liberty Acres LLC; Bosma Dairy Partners, LLC; Bosma Enterprises, Inc.; Mr. Henry Bosma; Ms. Henrietta Bosma; and Ms. Kathleen Nicolaus (collectively, "Defendants") for abatement of nitrate contamination of underground sources of drinking water that may present an imminent and substantial endangerment to the health of residents of the Lower Yakima Valley ("Residents").

3. The relief sought is intended to address nitrate contamination of drinking water supplied by aquifers in the Lower Yakima Valley by requiring Defendants to:

a. Perform corrective measures to abate the imminent and substantial endangerment posed by nitrate contamination of the aquifers; and
b. Pay civil penalties for their violations of the Administrative Consent Order entered between EPA and a subset of Defendants in 2013.

4. Authority to bring this action is vested in the United States Department of Justice by 28 U.S.C. §§ 516 and 519, and by 42 U.S.C. § 300i.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1345, and 1355, as well as 42 U.S.C. § 300i.

6. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1395(a), and under 42 U.S.C. § 300i(b), because the events giving rise to this action arose within this judicial district.

## PARTIES

7. Plaintiff is the United States of America, acting at the request of the EPA, an agency of the United States.

8. Defendants Cow Palace, LLC and the Dolsen Companies are a Washington limited liability company and Washington corporation that have, at all times relevant to this Complaint, owned or operated a dairy facility in Granger, Washington, located in Yakima County.

9. Defendant Three D Properties, LLC is a Washington limited liability company that has, at all times relevant to this Complaint, owned property in Granger, Washington, used by Cow Palace, LLC and the Dolsen Companies, in connection with dairy operations.

10. Defendants George DeRuyter and Son Dairy, L.L.C., and D and J Dairy, L.L.C. (f/k/a D and A Dairy, L.L.C.), are Washington limited liability

companies that have at all times relevant to this Complaint owned or operated a dairy facility in Outlook, Washington, located in Yakima County.

11. Defendant George & Margaret, L.L.C. is a Washington limited liability company that has at all times relevant to this Complaint owned property in Outlook, Washington, used by Defendants George DeRuyter and Son Dairy, L.L.C. and D and J Dairy, L.L.C., in connection with dairy operations.

12. Defendants Liberty Dairy, LLC, Bosma Dairy Partners, LLC and Bosma Enterprises, Inc., are Washington corporations or limited liability companies that have at all times relevant to this Complaint owned or operated dairy facilities near Zillah, Washington, located in Yakima County. These dairy facilities have operated under the names Bosma Dairy, Henry Bosma Dairy, Hank Bosma Dairy, and H&S Bosma Dairy.

13. Defendants Arizona Acres Limited Partnership and Liberty Acres LLC are a Washington limited liability partnership and a Washington limited liability company that have at all times relevant to this Complaint owned property in Zillah, Washington, used by Defendants Liberty Dairy, LLC, Bosma Dairy Partners, LLC, and Bosma Enterprises, Inc., in connection with dairy operations.

14. Defendants Mr. Henry Bosma, Ms. Henrietta Bosma, and Ms. Kathleen Nicolaus are individuals who have at all times relevant to this Complaint owned property in Zillah, Washington, used by Defendants Liberty Dairy, LLC,

Bosma Dairy Partners, LLC, and Bosma Enterprises, Inc., in connection with dairy operations.

**STATUTORY FRAMEWORK**

15. Under Section 1431(a) of the SDWA, 42 U.S.C. § 300i(a), EPA, upon receipt of information that a contaminant which is present in or likely to enter an underground source of drinking water, which may present an imminent and substantial endangerment to the health of persons, and that appropriate State and local authorities have not acted to protect the health of persons, may take such actions as it may deem necessary in order to protect the health of such persons.

16. Under Section 1431(a) of the SDWA, 42 U.S.C. § 300i(a), the United States is authorized to commence a civil judicial action for appropriate relief to protect the health of persons who are or may be users of the underground source of drinking water, including a restraining order or permanent or temporary injunction.

17. Under Section 1431(b) of the SDWA, 42 U.S.C. § 300i(b), a civil penalty may be assessed for a failure to comply with an administrative order issued under Section 1431(a), not to exceed the statutory maximum per day of violation as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, amended by the Debt Collection Improvement Act of 1996, and the subsequent Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. § 19.4. The current

statutory maximum for SDWA 42 U.S.C. § 300i violations occurring on or after November 2, 2015, is $29,154. *Id.*

## GENERAL ALLEGATIONS

### Health Effects of Nitrate in Drinking Water

18. Nitrate is a "contaminant" under the Act. 42 U.S.C. § 300f(6). It is capable of causing acute adverse health effects, including methemoglobinemia in infants (Blue Baby Syndrome), where red blood cells are unable to carry adequate levels of oxygen throughout the body. Blue Baby Syndrome, so named because babies with this syndrome may turn blue or grey because of oxygen deprivation, can lead to death within days if not promptly treated.

19. Recent studies have concluded that increased nitrate intake is also associated with increased risk of reproductive problems, such as spontaneous abortion, intrauterine growth restriction, selected birth defects, and certain types of cancers, such as colorectal, gastric, and non-Hodgkin's lymphoma.

20. Infants, pregnant women, dialysis patients, and individuals with gastrointestinal conditions or certain enzyme deficiencies are particularly sensitive to nitrate exposure and are at higher risk of potential adverse health effects.

21. Pursuant to its authority under Section 1412 of the SDWA, 42 U.S.C. § 300g-1, EPA has set the maximum contaminant level ("MCL") and maximum contaminant level goal ("MCLG") for nitrate. 40 C.F.R. §§ 141.51, 141.62(b)(7).

22. MCLs are enforceable standards for public water systems and do not apply to underground sources of drinking water. They represent the maximum level of a contaminant allowed in a public water system and are developed in consideration of contaminant detection limits and feasibility of treatment technologies. 42 U.S.C. § 300f(3). MCLGs are the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. 40 C.F.R. § 141.2. MCLGs only consider known or anticipated effects on public health.

23. At all times relevant to this Complaint, the MCL for nitrate is the same as the MCLG: 10 milligrams per liter ("mg/L"). 40 C.F.R. §§ 141.51, 141.62(b)(7). The limit can also be expressed as 10 parts per million ("ppm").

**<u>Nitrate Contamination from Dairy Operations</u>**

24. Defendants are at all times relevant to this Complaint "persons" within the meaning of Section 1401(12) of the Act, 42 U.S.C. § 300f(12).

25. Defendants own or operate three large dairy facilities, or they own land parcels used in connection with dairy facility operations such as land application of manure.

26. Dairy facilities are generally comprised of several areas, including:

a. Animal confinement areas, such as cow pens, feedlots, and milking parlors;

b. Areas for raw materials storage, such as feed silos and bedding;

c. Manure storage areas, such as compost piles and lagoons, which are large liquid waste ponds;

d. Areas for waste containment, which include settling basins and ditches to separate uncontaminated stormwater; and

e. Application fields, which are crop fields where liquid manure waste is applied as fertilizer.

27. Each dairy facility is a concentrated animal feeding operation ("CAFO") that houses several thousand dairy cattle. In 2023, each facility reported the following approximate numbers of total cattle:

a. Cow Palace, LLC: 13,050;

b. Liberty Dairy, LLC, Bosma Dairy Partners, LLC, and Bosma Enterprises, Inc: 7,450;

c. George DeRuyter and Son Dairy, L.L.C., D and J Dairy, L.L.C., and George & Margaret, L.L.C.: 10,730.

28. Cattle at each dairy facility produce tens of millions of gallons of liquid manure and hundreds of thousands of tons of solid manure each year, which is stored in piles or large lagoons and applied to application fields as fertilizer.

29. Manure contains nitrogen in organic and inorganic forms, which converts to nitrate as it moves in air, surface runoff, and through groundwater. Organic nitrogen generally requires microbial activity before plants are able to utilize it, whereas inorganic nitrogen—also referred to as "available nitrogen"—reflects the amount of nitrogen immediately available to plants.

30. Nitrate is highly mobile in soil and water. It may easily leach downward through soil into groundwater, which transports the nitrate in the direction of groundwater flow to form plumes.

31. Crops uptake some nitrate through their roots, such that manure must be applied agronomically—meaning at a rate consistent with crops' ability to uptake nutrients—to avoid excess nitrate traveling past the crop root zone. The crop root zone is the depth at which crops can take up nitrate.

32. Excess nitrate travels past the crop root zone and downward through the vadose zone, where it reaches groundwater. The vadose zone is the area between the ground surface and the groundwater table.

33. An aquifer is a body of permeable rock, sand, or gravel that holds groundwater. Two aquifers underlie the Lower Yakima Valley: a shallow alluvial aquifer ("Alluvial Aquifer") and a deeper basaltic aquifer ("Basalt Aquifer") (jointly, the "Aquifers").

34. Most Residents of the Lower Yakima Valley living downgradient of Defendants' facilities have no access to a public water system such that homes rely on private residential wells ("Residential Wells") to draw groundwater from the Aquifers.

35. The Aquifers are underground sources of drinking water within the meaning of the Act, 40 C.F.R. § 144.3.

36. Water drawn from Residential Wells in the Aquifers is used by Residents for human consumption, including drinking, cooking, and other household purposes.

37. Contaminants in the Aquifers are present in drinking water that Residents source from the Residential Wells.

38. EPA has received data indicating that nitrate above naturally occurring background levels is present in the Alluvial Aquifer and is likely to enter the Alluvial and Basalt Aquifers.

**Past Efforts to Address the Imminent and Substantial Endangerment**

39. In February 2010, EPA collected samples from some of the Residential Wells located downgradient of Defendants' dairy facilities.

40. The February 2010 samples indicated the Residential Wells contained nitrate far above the 10 mg/L MCL/MCLG for nitrate, including one well that tested as high as 46.6 mg/L.

41. EPA is authorized to issue an emergency administrative order under Section 1431 of the SDWA, 42 U.S.C. § 300i(a), when it receives information that a contaminant is present in or is likely to enter an underground source of drinking water, which may present an imminent and substantial endangerment to the health of persons, and that the appropriate State and local authorities have not acted to protect the health of such persons.

42. In March 2013, EPA exercised its emergency authority under 42 U.S.C. § 300i and entered into a consent order with a subset of Defendants (the "Consent Order").

43. The subset of Defendants subject to the Consent Order is: Cow Palace, LLC ("Cow Palace Dairy"); D and J Dairy, L.L.C. (f/k/a D and A Dairy, L.L.C.), George DeRuyter and Son Dairy, L.L.C., and George & Margaret, L.L.C. ("DeRuyter Dairy"); Liberty Dairy, LLC and its associated Dairy Facility H&S Bosma Dairy ("Bosma Dairy") (collectively, "the Dairies").

44. The Consent Order concluded that contaminants, including nitrate, were present in or likely to enter an underground source of drinking water and that it may present an imminent and substantial endangerment to the health of persons residing in the Lower Yakima Valley within the meaning of Section 1431 of the Act, 42 U.S.C. § 300i(a).

45. The Consent Order directed the Dairies to take immediate action deemed necessary to address the imminent and substantial endangerment presented by nitrate contamination from their operations, and required that the Dairies:

a. Offer homes using Residential Wells located on and within one mile downgradient of the Dairies that exceeded 10 mg/L for nitrate with alternative water supplies for all human consumption needs;
b. Take specific actions to control potential sources of nitrogen from the Dairies, including storage lagoons and application fields;
c. Establish a network of groundwater monitoring wells (“Monitoring Wells”) and conduct quarterly groundwater monitoring;
d. Improve nutrient management at the Dairies, including the rate at which manure is applied to fields; and
e. Perform the foregoing actions in accordance with EPA-approved plans, as specified.

46. The Consent Order included a statement of work describing the work the Dairies are required to implement (“Statement of Work”). The Consent Order required the Dairies to perform, at a minimum, all actions necessary to implement the Statement of Work.

47. The Dairies took some of the actions that were required by the Consent Order and Statement of Work, including performing quarterly

groundwater monitoring for eight years and providing some Residents with reverse osmosis filters.

48. However, the Dairies failed to take all actions required by the Consent Order and Statement of Work and failed to abate the imminent and substantial endangerment.

49. On multiple occasions, EPA communicated with one or more of the Dairies regarding the Dairies' efforts to comply with the Consent Order. This correspondence documents the Dairies' ongoing failure to fully comply with the Consent Order.

50. In 2013, citizen groups filed lawsuits in this Court under the Resource Conservation and Recovery Act ("RCRA") against each of the Dairies and owners of properties used by the Dairies regarding their ongoing nitrate contamination of underground sources of drinking water in the Lower Yakima Valley.

51. In 2015, this Court concluded that as to nitrate contamination from the operations at Cow Palace Dairy—including leakage from lagoons, nitrate accumulation beneath the lagoons, and over-application of manure to crop fields—"there can be no dispute that the Dairy's operations may present an imminent and substantial endangerment to the public who is consuming the contaminated water." *Community Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1228 (E.D. Wash. 2015).

52. Shortly thereafter, the Dairies and property owners entered into judicial consent decrees with the citizen groups to address the Dairies' ongoing nitrate contamination of the underground sources of drinking water in the Lower Yakima Valley (collectively, "the RCRA Consent Decrees").

53. Notwithstanding the 2013 Consent Order and the RCRA Consent Decrees, Defendants' activities have continued to result in nitrate contamination of the underground sources of drinking water in the Lower Yakima Valley and, therefore, Residents' drinking water.

**Present-Day Imminent and Substantial Endangerment**

54. As of the date of this Complaint, the imminent and substantial endangerment to Residents posed by the nitrate contamination of the underground sources of drinking water has not abated.

55. Each of the Dairies continues to generate tens of millions of gallons of liquid cow manure and hundreds of thousands of tons of solid cow manure each year.

56. The Dairies continue to apply manure at Defendants' properties at rates that exceed the capacity of crops to take up the nitrogen contained in the manure. Soil sampling from the Dairies' application fields shows that as of 2023, several fields still contain moderate to high concentrations of nitrate. At least four Bosma Dairy application fields contain between 15-30 ppm of nitrate, two Bosma

Dairy application fields contain 31-45 ppm of nitrate, and one DeRuyter Dairy field, GDS-SUO4, exceeds 45 ppm of nitrate.

57. Excess nitrate from field application on Defendants' properties continues to travel downward through the vadose zone and contaminates groundwater.

58. Nitrate has also accumulated in the soil around or beneath lagoons due to past or ongoing seepage from the lagoons. In September 2022, soil beneath Bosma Dairy Lagoons 1, 2, and 3 tested as high as 1,331 ppm for available nitrogen.

59. Nitrate accumulating in the soil around or beneath lagoons that have not been properly lined or abandoned continues to migrate downward through the soil and contaminates groundwater.

60. The Dairies' groundwater monitoring requirements under the Consent Order expired in Summer 2021. The Dairies have continued to voluntarily sample and report data from Monitoring Wells since Summer 2021, but that sampling and reporting is no longer subject to the parameters and validation procedures required under the Consent Order.

61. In 2022, groundwater monitoring data showed that nitrate concentrations exceeded 10 mg/L at 17 of the 22 Monitoring Wells downgradient of the Dairies for at least one quarter of the year. The highest nitrate concentration

reported was 182 mg/L at DC-03, located downgradient of Bosma Lagoons 2 and 3 and adjacent to Bosma Lagoon 1.

62. The Dairies reported more recent Monitoring Well data in 2023, but that data was subject to validation errors—such as violations of sample holding times—that decrease the reliability of the data.

63. Even with less reliable data, the fourth quarter 2023 Monitoring Well data reported by the Dairies still indicates several nitrate "hot spots" on or downgradient of Defendants' properties, including:

a. DC-03 (137 mg/L), located downgradient of Bosma Dairy animal confinement and manure storage areas, application fields, and Bosma Lagoons 2 and 3, and adjacent to Bosma Lagoon 1.

b. DC-14 (43 mg/L), located downgradient of Cow Palace Dairy animal confinement areas and manure storage areas, and near Cow Palace Lagoon 1;

c. YVD-10 (64.3 mg/L), located downgradient of Cow Palace Dairy and DeRuyter Dairy animal confinement and manure storage areas, application fields, and Cow Palace lagoons;

d. YVD-14R (111 mg/L) and YVD-08 (52 mg/L), located downgradient of Bosma Dairy and Cow Palace Dairy animal

confinement and manure storage areas and application fields, and downgradient or near Bosma Dairy lagoons;

e. YVD-09 (66.9 mg/L), located at Bosma Dairy animal confinement and compost areas and downgradient of Cow Palace Dairy animal confinement and manure storage areas, and application fields; and

f. YVD-11 (72.4 mg/L), located downgradient of DeRuyter Dairy animal confinement and manure storage areas, and application fields.

64. Analytical modeling based on available Monitoring Well and Residential Well data estimates that nitrate plumes from Defendants' properties extend several miles downgradient ("Affected Area").

65. The Dairies do not monitor groundwater at certain locations along their western and southern property boundaries. Consequently, some areas hydraulically downgradient of Defendants' properties lack sufficient data to estimate the extent of nitrate plumes from Defendants' properties. Modeling results indicate that Defendants contribute to nitrate exceedances of 10 mg/L more than one mile downgradient, such that Defendants may be contributing nitrate to groundwater in these data-scarce areas ("Potentially Affected Area") and possibly farther downgradient.

66. Nitrate plumes from Defendants' activities and properties may present an imminent and substantial endangerment to Residents in the Affected Area and Potentially Affected Area.

67. Recent data from Residential Wells is more limited than data from Monitoring Wells, but some data is available through the State's Ambient Groundwater Monitoring Network. The available data shows that Residential Wells in the Affected and Potentially Affected Areas continue to exceed or nearly exceed the nitrate MCL.

68. Between fall 2022 and summer 2023, Residential Wells in the Affected and Potentially Affected Areas within one mile downgradient of Defendants reported exceedances of the nitrate MCL, including but not limited to: GG-068 (13.2 mg/L); GG-071 (11.4 mg/L); GG-165 (10.7 mg/L); and GG-166 (12 mg/L).

69. In May and June 2023, Residential Wells in the Affected Area within three miles downgradient of Defendants reported exceedances of the nitrate MCL, including but not limited to: GG-179 (14 mg/L) and GG-074 (45.9 mg/L).

70. Residents in the Affected and Potentially Affected Areas who rely on drinking water from the Aquifers remain at risk of experiencing health problems associated with consuming nitrate above the MCL, including but not limited to Blue Baby Syndrome.

71. Babies born in the Affected and Potentially Affected Areas remain at risk of Blue Baby Syndrome caused by consumption of nitrate above the MCL. In 2022, census data reported 3,449 births in Yakima County, which is the county where the Affected and Potentially Affected Areas are located.

72. Defendants have individually and collectively caused or contributed to, and continue to cause or contribute to, the contamination and threatened contamination of an underground source of drinking water.

73. Defendants' historical and ongoing contamination of the underground sources of drinking water may present an imminent and substantial endangerment to the health of Residents in the Affected and Potentially Affected Areas within the meaning of Section 1431 of the Act, 42 U.S.C. § 300i(a).

74. Washington Department of Ecology and Washington Department of Health have agreed that continued application of federal resources is necessary to address the public health threat posed by nitrate contamination of the underground sources of drinking water downgradient of Defendants' properties.

75. The Washington Department of Ecology has issued and implements a CAFO General Permit for Cow Palace and DeRuyter Dairies to limit nitrate discharges from their dairy operations. Pursuant to a memorandum of understanding with the Department of Ecology, the Washington Department of

Agriculture helps to administer the CAFO General Permit. As of the date of this Complaint, Bosma Dairy remains unpermitted.

76. To date, the State's permitting efforts have not abated nitrate contamination over 10 mg/L in Residents' drinking water.

77. Yakima County has started to conduct limited outreach to Lower Yakima Valley residents to offer well testing and to provide alternative water. The County's outreach plans do not include Residents within one mile downgradient from Defendants and will not address source control measures.

78. State and local officials have therefore not acted as necessary to protect the health of Residents in the Affected and Potentially Affected Areas, but the Washington Departments of Health and Ecology have deferred to EPA to protect the health of Residents endangered by Defendants' historical and ongoing nitrate contamination of the Aquifers.

**Delays in Lining and Abandoning Manure Storage Lagoons**

79. Under Section III(F)(6) of the Statement of Work, the Dairies were required to submit to EPA a Lagoon Review Report within 60 days of the Consent Order's effective date, documenting that each of their existing manure storage lagoons were constructed in accordance with Washington State Natural Resources

Conservation Service, Conservation Practice Standard No. 313 – Waste Storage Facility (WA NRCS 313 standard).

80. Within 60 days of EPA approval of the Lagoon Review Report, for any lagoons not constructed to meet the current WA NRCS 313 standard, the Dairies were required to submit a plan for conducting an evaluation of each such lagoon at the Dairies' facilities, to determine whether each lagoon satisfies the current WA NRCS 313 standard ("Lagoon Evaluation Plan").

81. If the Lagoon Evaluation Plan concluded that a lagoon failed to meet the WA NRCS 313 standard, the Dairies were required to submit and implement a work plan describing, at the Dairies' election, measures to address leakage or how the Dairies will line those lagoons to meet the current standard at the rate of one lagoon per Dairy Facility per year ("Lagoon Work Plan").

82. These Lagoon Work Plans proposed deadlines for completion of the lining or abandonment work.

83. Through the process of reviewing and approving each Lagoon Work Plan, EPA imposed interim deadlines including but not limited to: submission of initial, revised, and final work plans; performance of work for lining or abandonment; performance of interim measures, such as soil testing and interim containment of contamination; and submission of summaries of completed construction activities ("As-Built Reports").

84. As set forth below, Bosma Dairy and DeRuyter Dairy consistently violated interim and final deadlines to complete lining or abandonment of their manure storage lagoons.

85. Bosma and DeRuyter Dairies' delays in completing lining or abandonment of their manure storage lagoons has prolonged nitrate contamination of the Aquifers from the lagoons and/or underlying soil and delayed abatement of the imminent and substantial endangerment to Residents.

*Bosma Dairy*

Lagoons 1-3

86. Bosma Dairy's Lagoons 1, 2, and 3 are among the largest and most contaminated of the Dairies' lagoons, with concentrations of available nitrogen in subsurface soils as high as 1,331 ppm.

87. Bosma Dairy elected to abandon Lagoons 1, 2, and 3 and submitted multiple draft plans to address clean-up of nitrate contamination at these lagoons.

88. Bosma Dairy failed to submit its plans in accordance with the Consent Order and EPA's approved deadlines.

89. Bosma Dairy submitted its Initial Abandonment Plan for Lagoons 1-3 on or around May 27, 2021.

90. Bosma Dairy was required to submit a Revised Abandonment Plan for Lagoons 1-3 by August 3, 2021, pursuant to EPA's letter dated July 2, 2021.

91. Bosma Dairy did not submit its Revised Abandonment Plan for Lagoons 1-3 until on or around January 18, 2022, and its Revised Abandonment Plan failed to address EPA's comments set forth in EPA's letter dated July 2, 2021.

92. Bosma Dairy was required to submit a Second Revised Abandonment Plan for Lagoons 1-3 by April 25, 2022.

93. Bosma Dairy submitted its Second Revised Abandonment Plan for Lagoons 1-3 by the April 25, 2022 extended deadline but failed to address EPA's comments set forth in EPA's letter dated March 9, 2022.

94. Bosma Dairy was required to submit its Third Revised Abandonment Plan for Lagoons 1-3 by August 1, 2022 pursuant to EPA's letter dated May 12, 2022.

95. Bosma Dairy failed to submit its Third Revised Abandonment Plan until on or around December 30, 2022.

96. Bosma Dairy repeatedly failed to address EPA's comment in its revised plans for abandonment of Lagoons 1, 2, and 3, which directed Bosma Dairy to include excavation of soil highly contaminated with nitrate in any abandonment plan for these lagoons.

97. Bosma Dairy's Third Revised Abandonment Plan ignored EPA's directive to include excavation of soil highly contaminated with nitrate, and instead proposed a new plan: installation of an evapotranspiration cap ("ET cap").

98. EPA evaluated Bosma Dairy's ET cap proposal and determined that, if implemented as drafted, Bosma Dairy's Third Revised Abandonment Plan will not abate the high concentrations of nitrate discharged into the Aquifers from Bosma Dairy's Lagoons 1-3.

99. Bosma Dairy's failure to submit an adequate abandonment plan for Bosma Lagoons 1-3 has prolonged nitrate contamination of the Aquifers from Lagoons 1, 2, and 3 and/or underlying soil and delayed abatement of the imminent and substantial endangerment to Residents.

100. In addition to Bosma Dairy's failure to submit an adequate abandonment plan to address the nitrate hot spot at Bosma Lagoons 1, 2, and 3, Bosma Dairy also failed to complete interim work at Lagoons 1, 2, and 3 by EPA-approved deadlines.

101. To minimize nitrate leaching into groundwater while Bosma Dairy completed abandonment of Lagoons 1, 2, and 3, EPA required that Bosma Dairy take interim measures including but not limited to re-grading the lagoons, installing sumps with pumps to detect and remove accumulating water, and installing cameras to ensure the sumps with pumps were functioning, as set forth in Bosma Dairy's Interim Containment Action Plan dated December 16, 2022.

102. Bosma Dairy was required to complete installation of interim containment measures by December 31, 2022 for Lagoons 1 and 2 pursuant to EPA's letters dated November 15, 2022 and December 9, 2022.

103. Bosma Dairy was required to complete installation of interim containment measures at Lagoon 3 by April 1, 2022 pursuant to EPA's letter dated March 9, 2022.

104. Bosma Dairy did not complete interim containment measures for Lagoons 1, 2, and 3 until on or around February 13, 2023.

105. Bosma Dairy's failure to timely complete interim containment measures at Lagoons 1, 2, and 3 prolonged nitrate contamination of the Aquifers from Lagoons 1, 2, and 3 and/or underlying soil and delayed abatement of the imminent and substantial endangerment to Residents.

106. Bosma Dairy was also required to conduct soil sampling at Lagoons 1, 2, and 3 pursuant to Bosma Dairy's April 22, 2022 Second Revised Abandonment Plan.

107. Bosma Dairy's Second Revised Abandonment Plan required Bosma Dairy to conduct soil testing at specified locations within Lagoons 1-3, including testing for total Kjeldahl nitrogen ("TKN"), sampling using a backhoe machine ("backhoe testing"), and follow-up sampling using an auger depending on the sampling results from backhoe testing.

108. Bosma Dairy failed to timely complete all required soil sampling for Lagoons 1-3. Bosma Dairy's failure to timely complete soil sampling has prevented a determination of the extent of nitrate contamination beneath the lagoons. This determination is necessary to inform work to address nitrate leaching from beneath Lagoons 1-3 into groundwater.

109. Bosma's failure to timely complete the required soil sampling has delayed further work to address this nitrate source, which has prolonged nitrate contamination of the Aquifers from Lagoons 1, 2, and 3 and/or underlying soil and delayed abatement of the imminent and substantial endangerment to Residents.

<u>Lagoon 18</u>

110. Bosma Dairy initially elected to line Lagoon 18.

111. Bosma Dairy was required to complete Lagoon 18 soil testing by April 1, 2020 and submit designs for the lagoon liner by June 1, 2020, pursuant to EPA's letter dated February 18, 2020.

112. On August 27, 2020, EPA notified Bosma Dairy that its deliverables were past due.

113. Bosma Dairy then elected to abandon Lagoon 18. On or around September 17, 2020, Bosma Dairy submitted a lagoon abandonment plan to EPA in lieu of a liner design for Lagoon 18.

114. Bosma Dairy was required to complete abandonment of Lagoon 18 by December 31, 2020, pursuant to its Revised Abandonment Plan dated November 3, 2020.

115. Based on its completion report submitted on or around May 16, 2022, Bosma Dairy claims it completed abandonment of Lagoon 18 on or around May 2022.

116. Bosma Dairy's failure to timely complete abandonment of Lagoon 18 prolonged nitrate contamination of the Aquifers from Lagoon 18 and/or underlying soil and delayed abatement of the imminent and substantial endangerment to Residents.

<u>Lagoons 8, 9, and 19</u>

117. Bosma Dairy elected to abandon Lagoons 8, 9, and 19.

118. Bosma Dairy was required to complete abandonment, including site restoration, at these three lagoons by December 31, 2019, pursuant to EPA's letters dated September 18, 2019 and November 7, 2019.

119. Bosma Dairy did not complete abandonment, including site restoration, of Lagoons 8, 9, and 19 until on or around April 1, 2021.

120. Bosma Dairy's failure to timely complete abandonment of Lagoons 8, 9, and 19 prolonged nitrate contamination of the Aquifers from Lagoons 8, 9, and

19 and/or underlying soil and delayed abatement of the imminent and substantial endangerment to Residents.

*DeRuyter Dairy*

Take-Up Pond

121. DeRuyter Dairy elected to abandon its Take-Up Pond. DeRuyter was required to complete abandonment of its Take-Up Pond by December 31, 2021, pursuant to EPA's letter dated January 8, 2021.

122. DeRuyter Dairy did not complete abandonment of its Take-Up Pond until on or around June 10, 2022.

123. DeRuyter Dairy repeatedly failed to address EPA's comments in its revised plans for abandonment of its Take-Up Pond. These failures resulted in DeRuyter submitting five abandonment plans on or around June 1, 2021, August 18, 2021, October 8, 2021, November 16, 2021, and November 23, 2021, before it submitted a final plan on or around December 21, 2021 that EPA approved.

124. DeRuyter Dairy's failure to timely complete abandonment of its Take-Up Pond prolonged nitrate contamination of the Aquifers from the DeRuyter Take-Up Pond and/or underlying soil and delayed abatement of the imminent and substantial endangerment to Residents.

Lagoon 1

125. DeRuyter Dairy elected to line Lagoon 1.

126. DeRuyter Dairy was required to complete construction of the Lagoon 1 liner by December 31, 2021, pursuant to EPA's letter dated January 8, 2021.

127. DeRuyter Dairy did not complete lining of Lagoon 1 until on or around June 9, 2022.

128. DeRuyter Dairy repeatedly failed to address EPA's comments in its revised plans for lining Lagoon 1. These failures resulted in DeRuyter Dairy submitting four liner construction plans on or around May 26, 2021, September 23, 2021, October 8, 2021, and December 21, 2021, before it submitted a final plan on January 11, 2022 that EPA approved.

129. DeRuyter Dairy was required to complete soil testing on Lagoon 1 by April 1, 2021, pursuant to EPA's letter dated January 8, 2021.

130. DeRuyter Dairy did not complete soil testing on Lagoon 1 until on or around October 30, 2021.

131. DeRuyter Dairy's failure to timely complete soil testing at Lagoon 1 delayed determination of the extent of nitrate contamination beneath the lagoons, which was necessary to inform work to address nitrate leaching from beneath Lagoon 1 into groundwater.

132. DeRuyter Dairy's failure to timely complete the required soil sampling delayed further work to address this nitrate source, which prolonged

nitrate contamination of the Aquifers from Lagoon 1 and/or underlying soil and delayed abatement of the imminent and substantial endangerment to Residents.

**<u>Failure to Report Liner Issues at Cow Palace Lagoon 1</u>**

133. Cow Palace Dairy elected to line Lagoon 1.

134. On or about November 28, 2019, during installation of the liner for Lagoon 1, a windstorm damaged the lower liner by ripping a 350-foot tear across the middle of the liner.

135. Cow Palace Dairy was required to disclose the Lagoon 1 lower-liner tear to EPA in December 2019, when it submitted its Monthly Progress Report.

136. Cow Palace Dairy did not disclose the Lagoon 1 lower-liner tear to EPA until on or around March 31, 2020, when it submitted its As-Built Report summarizing completion of Lagoon 1 lining activities.

137. Cow Palace Dairy was required to submit to EPA the As-Built Report for completion of construction activities at Lagoon 1 by February 1, 2020, pursuant to EPA's letter dated December 1, 2019.

138. Cow Palace Dairy's March 31, 2020 As-Built Report stated that Cow Palace Dairy repaired the torn lower liner between November 29 and December 6, 2020 and installed it at Lagoon 1.

139. Beginning on or around February 2020, approximately 122,051 gallons of liquid manure leaked through the upper liner in Lagoon 1. The leak

required Cow Palace Dairy to make repairs to the Lagoon 1 upper liner in May 2020 before returning it to service.

140. Under the Cow Palace Dairy Facility Operations, Maintenance, and Monitoring Plan ("O&M Plan"), approved by EPA on or around April 19, 2019, Cow Palace Dairy is required to report large leaks—meaning leaks greater than or equal to 2,800 gallons per day—to EPA within seven days of detection.

141. The February 2020 leak of approximately 122,051 gallons was a large leak requiring disclosure to EPA within seven days of detection.

142. An inspection report, submitted to EPA with Cow Palace Dairy's 2020 Annual Report, indicated that Cow Palace Dairy detected the leak at Lagoon 1 no later than March 4, 2020, such that reporting to EPA was required no later than March 11, 2020.

143. Cow Palace Dairy did not disclose to EPA the February 2020 large leak from Lagoon 1 until on or around March 1, 2021, when it submitted its 2020 Annual Report.

144. Cow Palace Dairy also did not disclose to EPA the February 2020 large leak from Lagoon 1 in any of its subsequent Monthly Progress Reports.

145. Cow Palace Dairy's failure to timely report to EPA issues installing and operating the liner at Cow Palace Lagoon 1 prevented EPA oversight of repair efforts to ensure that Cow Palace Dairy implemented effective repairs.

146. EPA's inability to review Cow Palace Dairy's repair efforts has potentially prolonged nitrate contamination of the Aquifers from Lagoon 1 and delayed abatement of the imminent and substantial endangerment to Residents.

**Ongoing Leakage from Cow Palace Lagoon 1**

147. From September 2016 until June 2020, monitoring well DC-14, located about 50 yards downgradient of Lagoon 1, consistently tested below 10 mg/L.

148. In June 2020, nitrate levels at DC-14 exceeded 10 mg/L for the first time since September 2016.

149. On or around January 27, 2022, EPA wrote to Cow Palace Dairy regarding its concern that the liner system in Lagoon 1 may be leaking based on spiking nitrate levels at monitoring well DC-14.

150. On or around April 20, 2022, EPA directed Cow Palace Dairy to prepare and submit by May 20, 2022 materials to address the potential leakage at Cow Palace Lagoon 1, including an addendum to its Quality Assurance and Quality Control Manual ("QA/QC Manual") for tests to determine whether Lagoon 1 was leaking and a schedule to test Lagoon 1 for leakage.

151. Cow Palace Dairy never submitted the addendum to the QA/QC Manual and has not tested Lagoon 1 for leakage.

152. Since June 2020, monitoring well DC-14 has tested above 10 mg/L in every quarter, with concentrations reaching as high as 57.4 mg/L in June 2022. Based on the spiking nitrate levels at DC-14, Lagoon 1 is likely leaking due to a liner failure such that immediate testing for leakage is appropriate.

153. Cow Palace's failure to test Cow Palace Lagoon 1 for leakage has potentially prolonged nitrate contamination of the Aquifers from Cow Palace Lagoon 1 and/or underlying soil and delayed abatement of the imminent and substantial endangerment to Residents.

**Failure to Operate Moisture Sensors in Application Fields**

154. Under Section III(F)(2) of the Statement of Work, the Dairies must work with a professional irrigation consultant to prepare and submit an Irrigation Water Management Plan that describes a system for irrigation water management.

155. To minimize the amount of nitrate leaching past the root zone, the Irrigation Water Management Plan requires the installation of electronic sensors in and below the crop root zone in each application field to provide for automatic shut-off of the irrigation system if moisture is detected below the root zone at the three-foot depth.

156. The Dairies submitted their Irrigation Management Plans on August 4, 2014, which were conditionally approved by EPA on August 12, 2014. The Dairies submitted their final Irrigation Water Management Plans on August 15, 2014.

157. Each Irrigation Water Management Plan requires monitoring of soil moisture in application field soils at various depths during active irrigation.

158. Each Irrigation Water Management Plan prohibits irrigation of application fields when moisture sensors are not in use.

159. Each Irrigation Water Management Plan requires either two or three soil moisture monitoring locations in each of the Dairies' 34 application fields. Each monitoring location includes three moisture sensors at different soil depths.

160. The Dairies installed moisture sensors as provided in the Irrigation Water Management Plans on or around November 2014.

161. The Dairies, individually and collectively, failed to consistently operate moisture sensors between 2019 and 2023, on or around the dates set forth in Appendix A.

162. The Dairies' failure to consistently operate moisture sensors prevented shut-off of the irrigation systems, which prolonged nitrate contamination of the Aquifers from manure application fields and delayed abatement of the imminent and substantial endangerment to Residents.

**Overapplication of Manure to Fields**

163. Section III(F)(7) of the Statement of Work requires the Dairies to "endeavor to avoid transporting manure to locations where groundwater is known by [the Dairies] to currently exceed 10 mg/L nitrate." It also prohibits manure

application to crop fields in such areas if the post-harvest soil sample exceeds 45 ppm nitrate at the 2-foot depth.

164. In 2019, DeRuyter Dairy transported and applied 1,116,000 gallons of liquid manure to a field without having collected the requisite soil sampling data.

165. Based on the field's location on or near the 1-mile downgradient boundary under the Consent Order, and nitrate data from nearby residential well GG-068, groundwater in this area was known by DeRuyter Dairy to exceed 10 mg/L.

166. DeRuyter Dairy's excessive application of manure to fields and failure to collect the requisite soil data before application has prolonged nitrate contamination of the Aquifers and delayed abatement of the imminent and substantial endangerment to Residents.

**Failure to Report Off-Site Transportation of Manure**

167. Section III(F)(7) of the Statement of Work requires the Dairies to maintain records of locations to which manure is transported off-site from Dairies' facilities and to submit those records in the Annual Report submitted to EPA.

168. In 2022, all the Dairies collectively reported that more than 16 million gallons of liquid manure and over 110,000 tons of solid manure were transported off-site that year, but failed to maintain and submit to EPA any records of where that manure was transported.

a. Bosma Dairy reported approximately 1 million gallons of liquid manure and 33,000 tons of solid manure transported off-site in 2022, without providing EPA with records of where the manure was transported.

b. DeRuyter Dairy reported 12.78 million gallons of liquid manure and 44,378 tons of solid manure transported off-site in 2022, without providing EPA with records of where the manure was transported.

c. Cow Palace Dairy reported 4.23 million gallons of liquid manure and 33,600 tons of solid manure transported off-site in 2022, without providing EPA with records of where the manure was transported.

169. In 2023, all the Dairies collectively reported that more than 9 million gallons of liquid manure and almost 80,000 tons of solid manure were transported off-site that year, but failed to maintain and submit to EPA any records of where that manure was transported.

a. Bosma Dairy reported approximately 2 million gallons of liquid manure and 32,000 tons of solid manure transported off-site in 2023, without providing EPA with records of where the manure was transported.

b. DeRuyter Dairy reported 2.4 million gallons of liquid manure and 19,339 tons of solid manure transported off-site in 2023, without providing EPA with records of where the manure was transported.

c. Cow Palace Dairy reported 4.63 million gallons of liquid manure and 28,483 tons of solid manure transported off-site in 2023, without providing EPA with records of where the manure was transported.

170. The Dairies' failure to provide to EPA records of the locations where manure is transported has impeded EPA oversight of the Dairies' off-site transport of manure to ensure that the Dairies are not applying manure to nitrate-saturated fields. EPA's lack of oversight into the Dairies' off-site transport of manure has potentially prolonged nitrate contamination of the Aquifers from manure application fields and delayed abatement of the imminent and substantial endangerment to Residents.

**Incomplete Soil Sampling and Reporting**

171. Under Section III(F)(1)(c) and (e) of the Statement of Work, the Dairies must take spring "pre-planting" and fall "post-harvest" soil samples from their manure application fields at specified locations and depths.

172. The soil samples are to provide information on soil nitrate concentrations in and moving below the crop root zones in the Dairies' application fields.

173. The soil samples must be collected in accordance with the Dairies' Dairy Facility Application Field Management Plans, Nutrient Management Plans, and U.S. Natural Resources Conservation Service's soil sampling guidance.

174. On September 23, 2021, EPA advised the Dairies that soil sampling of manure application fields must continue until termination of the Consent Order. Nevertheless, the Dairies stopped soil sampling required by the Consent Order at their application fields in or around Spring 2022.

175. Instead, the Dairies have conducted soil sampling since Fall 2022 under the CAFO General Permit, which lacks sufficient information for EPA to assess whether the Dairies complied with Consent Order requirements. The missing information includes but is not limited to data validation reports and the number and locations of samples collected from each application field.

176. The Dairies failed to provide the fall "post-harvest" soil samples for 2022 as required under Section III(F)(1)(c) and (e).

177. The Dairies failed to provide the spring "pre-planting" and fall "post-harvest" soil samples for 2023 as required under Section III(F)(1)(c) and (e).

178. The Dairies' failure to provide current, accurate soil sampling data prevents EPA oversight of nitrate levels in application fields to ensure that the Dairies are not over-applying manure.

179. The Dairies' failure to comply with soil sampling and reporting requirements for their manure application fields has potentially prolonged nitrate contamination of the Aquifers from manure application fields and delayed abatement of the imminent and substantial endangerment to Residents.

## FIRST CLAIM FOR RELIEF

(Injunctive Relief – All Defendants – to Abate an Imminent and Substantial Endangerment in Drinking Water)

180. Paragraphs 1 through 179 are realleged and incorporated by reference.

181. The Director of the Enforcement and Compliance Assurance Division of EPA Region 10, upon authority delegated by the Administrator of EPA, is in receipt of information that nitrate—a contaminant—is present in or likely to enter the Aquifers, which may present an imminent and substantial endangerment to the health of Residents in the Affected and Potentially Affected Areas that rely on the Aquifers as an underground source of drinking water.

182. The Director of the Enforcement and Compliance Assurance Division of EPA Region 10, by his authorized delegate, has consulted with the State and local authorities in order to confirm the correctness of the information and to

ascertain that those authorities have not taken and will not take action necessary to protect the health of the Residents.

183. The actions or inactions of Defendants, individually and collectively, have caused or contributed to, and continue to cause or contribute to, the imminent and substantial endangerment.

184. Because the imminent and substantial endangerment to Residents in the Affected and Potentially Affected Areas remains ongoing, the Defendants are liable for injunctive relief for corrective measures as provided under Section 1431(a) of the SDWA, 42 U.S.C. § 300i(a), including but not limited to immediate well testing and provision of alternate water based on test results to Residents in the Affected and Potentially Affected Areas, until the imminent and substantial endangerment is abated.

## SECOND CLAIM FOR RELIEF

(Violation of the Consent Order – All Dairies – Failure to Implement Plans or Documents as Approved by EPA in Accordance with EPA-Approved Schedule)

185. Paragraphs 1 through 179 are realleged and incorporated by reference.

186. As set forth in Paragraphs 42-46, EPA and the Dairies entered into a Consent Order on March 19, 2013, requiring compliance with its requirements.

187. Paragraph 14(b) of the Consent Order required the Dairies to implement each plan or document as approved in writing by EPA, in accordance

with the schedule approved by EPA, or to submit revised submissions as specified by EPA.

188. As set forth in Paragraphs 79-132, 139-146, 147-153, 154-162, 167-70, and 171-179, the Dairies, individually and collectively, failed to timely comply with Paragraph 14(b) of the Consent Order with respect to lining or abandonment of storage lagoons; reporting large leaks from lagoons; testing for potential leaks at lagoons; operation of moisture sensors; and soil sampling of application fields and reporting the same.

189. Under Section 1431(b) of the SDWA, 42 U.S.C. § 300i(b), the Dairies are liable for civil penalties of up to $29,154 per day for each violation of the 2013 Consent Order for penalties assessed after December 27, 2023 as codified at 40 C.F.R. § 19.4.

## **THIRD CLAIM FOR RELIEF**

(Violation of Consent Order – Bosma Dairy – Failure to Timely Provide Information As to Lagoon 18)

190. Paragraphs 1 through 179 are realleged and incorporated by reference.

191. Paragraph 21 of the Consent Order requires the Dairies to provide to EPA, upon request, copies of all documents and information within their possession or control or that of their contractors, employees, or agents relating to implementation of the Consent Order.

192. This information includes, but is not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, correspondence, or other documents relating to the Dairies' work performed under the Consent Order.

193. On or about November 1, 2021, EPA requested documents including, but not limited to, plans, drawings, and descriptions relating to the presence of water in Bosma Dairy's Lagoon 18 and construction of the sump adjacent to Lagoon 18.

194. EPA required that Bosma Dairy provide the requested information by November 29, 2021 and include the certification required by Paragraph 17 of the Consent Order as to the truth, accuracy, and completeness of the documents.

195. On November 29, 2021, Bosma Dairy responded to EPA without providing all information requested in EPA's letter.

196. Bosma Dairy's November 29, 2021 response to EPA's request for information also did not include the certification required by Paragraph 17 of the Consent Order.

197. On March 18, 2022, EPA notified Bosma Dairy that its November 29, 2021 response was deficient and EPA renewed its request for the Lagoon 18 information.

198. Bosma Dairy did not respond to EPA's second request for information related to Lagoon 18.

199. As set forth in Paragraphs 195-198, Bosma Dairy failed to comply with Paragraph 21 of the Consent Order.

200. Under Section 1431(b) of the SDWA, 42 U.S.C. § 300i(b), Bosma Dairy is liable for civil penalties of up to $29,154 per day for each violation of the 2013 Consent Order for penalties assessed after December 27, 2023 as codified at 40 C.F.R. § 19.4.

**FOURTH CLAIM FOR RELIEF**

(Violation of Consent Order – Cow Palace Dairy – Failure to Perform All Actions Necessary to Implement the Statement of Work As to Lagoon 1)

201. Paragraphs 1-179 are realleged and incorporated by reference.

202. Paragraph 14(a) of the Consent Order required the Dairies to perform, at a minimum, all actions necessary to implement the Statement of Work.

203. Paragraph III(K)(1) of the Statement of Work requires the Dairies to submit Monthly Progress Reports, which must describe all problems encountered and any anticipated problems and actual or anticipated delays, and solutions developed and implemented to address any actual or anticipated problems or delays.

204. As set forth in Paragraphs 133-153, Cow Palace Dairy violated Paragraph 14(a) of the Consent Order and Paragraph III(K)(1) of the Statement of Work by failing to submit Monthly Progress Reports describing all problems encountered as to Lagoon 1.

205. The lower-liner tear for the Cow Palace Lagoon 1 liner that occurred during the November 2019 windstorm was a “problem encountered” as defined under Paragraph III(K)(1) of the Statement of Work that required flagging in a Monthly Progress Report.

206. Cow Palace Dairy did not report the November 2019 Lagoon 1 lower-liner tear to EPA until on or around March 31, 2020.

207. After the November 2019 liner tear, Cow Palace Dairy submitted four Monthly Progress Reports to EPA pursuant to Paragraph III(K)(1) that did not report the Lagoon 1 liner tear.

208. For each Monthly Progress Report that Cow Palace Dairy submitted to EPA without reporting the Lagoon 1 liner tear, Cow Palace Dairy violated Paragraph 14(a) of the Consent Order and Paragraph III(K)(1) of the Statement of Work and is liable for civil penalties for each day of violation.

209. The large leak at Lagoon 1 in February 2020 that required repairs to the upper liner was a “problem encountered” as defined under Paragraph III(K)(1) of the Statement of Work.

210. Cow Palace Dairy did not report the February 2020 Lagoon 1 upper-liner leak to EPA until on or around March 1, 2021.

211. After the February 2020 liner leak, Cow Palace Dairy submitted eleven Monthly Progress Reports to EPA pursuant to Paragraph III(K)(1) that did not report the Lagoon 1 upper-liner leak.

212. For each Monthly Progress Report that Cow Palace Dairy submitted to EPA without reporting the Lagoon 1 upper-liner leak, Cow Palace Dairy violated Paragraph 14(a) of the Consent Order and Paragraph III(K)(1) of the Statement of Work and is liable for civil penalties for each day of violation.

213. Under Section 1431(b) of the SDWA, 42 U.S.C. § 300i(b), Cow Palace Dairy is liable for civil penalties of up to $29,154 per day for each violation of the 2013 Consent Order for penalties assessed after December 27, 2023 as codified at 40 C.F.R. § 19.4.

## **FIFTH CLAIM FOR RELIEF**

(Violation of the Consent Order – DeRuyter Dairy – Failure to Perform All Actions Necessary to Implement the Statement of Work as to Land Application of Manure)

214. Paragraphs 1 through 179 are realleged and incorporated by reference.

215. Paragraph 14(a) of the Consent Order required the Dairies to perform, at a minimum, all actions necessary to implement the Statement of Work.

216. As set forth in Paragraphs 163-166, DeRuyter Dairy failed to comply with Paragraph 14(a) of the Consent Order with respect to land application of manure.

217. Under Section 1431(b) of the SDWA, 42 U.S.C. § 300i(b), DeRuyter Dairy is liable for civil penalties of up to $29,154 per day for each violation of the 2013 Consent Order for penalties assessed after December 27, 2023 as codified at 40 C.F.R. § 19.4.

## **SIXTH CLAIM FOR RELIEF**

(Violation of the Consent Order – All Dairies – Failure to Perform All Actions Necessary to Implement the Statement of Work As to Off-Site Transportation of Manure)

218. Paragraphs 1 through 179 are realleged and incorporated by reference.

219. Paragraph 14(a) of the Consent Order required the Dairies to perform, at a minimum, all actions necessary to implement the Statement of Work.

220. As set forth in Paragraphs 167-170, the Dairies, individually and collectively, failed to timely comply with Paragraph 14(a) of the Consent Order with respect to reporting off-site transportation of manure.

221. Under Section 1431(b) of the SDWA, 42 U.S.C. § 300i(b), the Dairies are liable for civil penalties of up to $29,154 per day for each violation of the 2013

Consent Order for penalties assessed after December 27, 2023 as codified at 40 C.F.R. § 19.4.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States, prays that the Court:

1. Order injunctive relief as necessary to abate the imminent and substantial endangerment posed by nitrate contamination of drinking water;
2. Order the Dairies to comply with all outstanding requirements under the 2013 Consent Order;
3. Enter a money judgment against the Dairies for civil penalties not to exceed $29,154 for each day for each violation of the 2013 Consent Order, pursuant to Sections 1431(a) and (b) of the SDWA, 42 U.S.C. §§ 300i(a) and (b);
4. Award court costs to the United States; and
5. Grant such other relief as this Court deems just and proper.

Respectfully submitted this 26th day of June 2024.

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

/s/Andrene E. Dabaghi
ANDRENE E. DABAGHI (IL BAR #6326789)
GENEVIEVE S. PARSHALLE (CA BAR #307228)

United States Department of Justice
Environment & Natural Resources Division
Environmental Enforcement Section
150 M Street NE
Washington, D.C. 20002
(202) 598-9576
Andrene.Dabaghi@usdoj.gov
Genevieve.Parshalle@usdoj.gov

VANESSA R. WALDREF
United States Attorney
Eastern District of Washington

/s/ Derek T. Taylor
DEREK T. TAYLOR
Assistant United States Attorney
United States Attorney's Office
Eastern District of Washington
920 West Riverside Avenue, Suite 340
Spokane WA 99201
(509) 835-6319
Derek.Taylor@usdoj.gov

OF COUNSEL:

J. MATTHEW MOORE
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 10
1200 Sixth Ave., Suite 155
Seattle, WA 98101
(206) 553-6266
moore.johnm@epa.gov

DANIELLE GRANATT
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 10
1200 Sixth Avenue, Suite 155

Seattle, Washington 98101
(206) 553-2108
granatt.danielle@epa.gov