UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

v.

COW PALACE, LLC; THE DOLSEN COMPANIES; THREE D PROPERTIES, LLC; GEORGE & MARGARET, L.L.C.; GEORGE DERUYTER AND SON DAIRY, L.L.C.; D AND J DAIRY, L.L.C. (f/k/a D AND A DAIRY, L.L.C.); LIBERTY DAIRY, LLC; ARIZONA ACRES LIMITED PARTNERSHIP; LIBERTY ACRES LLC; BOSMA DAIRY PARTNERS, LLC; BOSMA ENTERPRISES, INC.; HENRY BOSMA; HENRIETTA BOSMA; and
KATHLEEN NICOLAUS,

Defendants.

NO. 1:24-CV-3092-TOR

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

BEFORE THE COURT is Plaintiff's Motion for Preliminary Injunction. ECF No. 13. This matter was heard without oral argument. The Court has

reviewed the record and files herein and is fully informed. For the reasons discussed below, Plaintiff's Motion for Preliminary Injunction (ECF No. 13) is GRANTED.

**BACKGROUND**

This case concerns Defendants' manure management practices at dairy operations in the Lower Yakima Valley that are contaminating downgradient residents' drinking water. As a result, the United States, on behalf of the U.S. Environmental Protection Agency ("EPA") seeks a preliminary injunction under Section 1431 of the Safe Drinking Water Act ("SDWA") requiring Defendants to immediately provide alternative water to impacted residents; resume appropriate monitoring of nitrate in groundwater; and address potential leakage from a manure storage lagoon. The high nitrate levels in the groundwater are an extreme danger to the public's health and the United States is fully authorized to take this action.

**DISCUSSION**

**A. Preliminary Injunction**

Pursuant to Federal Rule of Civil Procedure 65, the Court may grant preliminary injunctive relief in order to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b)(1)(A). To obtain this relief, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of preliminary relief; (3) that a balancing of the

hardships weighs in plaintiff's favor; and (4) that a preliminary injunction will advance the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012). Under the *Winter* test, a plaintiff must satisfy each element for injunctive relief.

Alternatively, the Ninth Circuit also permits a "sliding scale" approach under which an injunction may be issued if there are "serious questions going to the merits" and "the balance of hardships tips sharply in the plaintiff's favor," assuming the plaintiff also satisfies the two other *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("[A] stronger showing of one element may offset a weaker showing of another."); *see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) ("We have also articulated an alternate formulation of the *Winter* test, under which serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." (internal quotation marks and citation omitted)).

**B. Likelihood of Success on the Merits**

To obtain injunctive relief, Plaintiff must show that there are "serious questions going to the merits" of its claim, and that it is likely to succeed on those questions of merit. *Cottrell*, 632 F.3d at 1131; *Farris*, 677 F.3d at 865. Plaintiff

has come forward with sufficient evidence that the nitrates are an extreme danger to the public's health that draws their water from contaminated wells.

**C. Irreparable Injury**

Plaintiff contends the public will suffer irreparable injury absent preliminary injunctive relief. ECF No. 13. A plaintiff seeking injunctive relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Plaintiff has a duty to protect the health and well-being of its residents that are being affected by the high levels of nitrate. This injury is irreparable absent a preliminary injunction.

**D. Balancing of Equities and Public Interest**

Finally, Plaintiff contends that the balance of equities and public interest weigh in favor of granting injunctive relief in this case. ECF No. 13. "When the

government is a party, these last two factors merge." *Drakes Bay v. Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

"In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotation marks and citation omitted). The Court must balance the hardships to the parties should the *status quo* be preserved against the hardships to the parties should Plaintiff's requested relief be granted. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quotation omitted). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (citation omitted).

More importantly, though, failure to grant injunctive relief would have a significant impact on the public's health. The public interest weighs heavily in favor of granting preliminary injunctive relief.

## CONCLUSION

The Court finds that Plaintiff has satisfied all elements of the *Winter* test, and preliminary injunctive relief is appropriate.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

Defendants' Motion to Strike the United States' Reply, ECF No. 76, is **DENIED**.

Plaintiff's Motion for Preliminary Injunction (ECF No. 13) is **GRANTED**.

Defendants must immediately implement the requirements of this Preliminary Injunction, as set forth in Paragraphs 1–3, and must notify the Court within 14 days of any failure to comply. No bond shall be required pursuant to Fed. R. Civ. P. 65(c).

**1. Outreach to Residents in Affected and Potentially Affected Areas for Provision of Alternative Water**

Defendants shall immediately commence outreach and testing of residential drinking water wells within the Affected and Potentially Affected Areas ("Residential Wells"), as depicted in Appendix A to United States' Motion for Preliminary Injunction, for provision of alternative water. Residential Wells include wells that serve a single residence, shared wells that serve two residences, and wells that serve fewer than 15 residences and fewer than 25 people per day.

A. <u>Quality Assurance Project Plan</u>

Within 30 days of entry of this Preliminary Injunction, Defendants shall submit to EPA for review and approval a Quality Assurance Project Plan for

conducting residential well testing and outreach ("2024 Residential Well QAPP"). The 2024 Residential Well QAPP shall include:

*i. Parameters and Procedures*

The same parameters and procedures, including those regarding data generation and acquisition, assessment, and data validation and usability, as set forth in the Quality Assurance Project Plan for Residential Well Sampling dated April 26, 2013 ("2013 Residential Well QAPP") submitted pursuant to the Administrative Order on Consent, EPA Docket No. SDWA-10-2013-0080, between EPA and Cow Palace, LLC; D and J Dairy, L.L.C. (f/k/a D and A Dairy, L.L.C.); George DeRuyter and Son Dairy, L.L.C.; George & Margaret, L.L.C.; Liberty Dairy, LLC and its associated Dairy Facility H&S Bosma Dairy. Winiecki Decl., Ex. A ("2013 Consent Order"). The 2024 Residential Well QAPP shall include amendments to the 2013 Residential Well QAPP only as necessary to comply with this Preliminary Injunction.

*ii. Third-Party Organizations*

The names and credentials of two or more independent, third-party organizations to be retained by Defendants who shall coordinate with residents in the Affected and Potentially Affected Areas and assist with delivering Spanish and English language public health-related messages. These messages will notify residents of the Affected and Potentially Affected Areas that their drinking water

may be impacted by elevated nitrate levels and inform residents of the health risks associated with elevated nitrate levels in drinking water. The messages will also provide information regarding free well testing and, for residential wells with nitrate concentrations greater than 10 mg/L, availability of an alternative drinking-water supply. Collectively, the selected third-party organizations shall have demonstrated experience: (a) conducting meaningful engagement with communities with environmental justice concerns; (b) providing public-health services through community-health workers; (c) conducting community outreach, including door-to-door canvassing; and (d) building relationships with residents in the Lower Yakima Valley. The selected third-party organizations must have sufficient personnel to accomplish the work required by this Preliminary Injunction within the time frames set forth herein.

B. Notice to Residents of Affected and Potentially Affected Areas

All communications with residents in the Affected and Potentially Affected Areas, including written, verbal, and in-person communication, shall be offered in English and Spanish. All written communications with residents in the Affected and Potentially Affected Areas, including notices of testing, explanation of results, offers for alternative water, and the annual notices described in this Paragraph 1.B shall be approved in advance by EPA. Annually, for the duration of this Preliminary Injunction, Defendants shall notify residents in the Affected and

Potentially Affected Areas that their drinking water may be impacted by elevated nitrate levels and inform residents of the health risks associated with elevated nitrate levels in drinking water. This annual notice must inform residents in the Affected and Potentially Affected Area of the free well testing available under Paragraph 1.G and the alternative water available to residences where nitrate concentrations exceed 10 mg/L under Paragraph 1.E. Defendants shall provide notice in a form and manner that is reasonably calculated to reach all residents in the Affected and Potentially Affected Areas, based on consultation with the third-party organizations.

C. Testing of Residents' Drinking Water

Within 60 days of EPA's approval of the 2024 Residential Well QAPP, a representative of at least one of the third-party organizations that meets the requirements of Paragraph 1.A.ii(b) of this Preliminary Injunction shall visit each residence that relies on Residential Wells for drinking water in the Affected and Potentially Affected Areas on behalf of Defendants to collect a drinking water sample and submit the sample to a state-accredited drinking water laboratory for analysis. Efforts to visit each residence, including timing and follow-up contact requests, shall be reasonably calculated to achieve contact with the occupant based on consultation with the third-party organizations. Defendants must attempt a minimum of three good-faith efforts to contact each residence.

Prior to conducting testing at each residence, Defendants shall provide notice in a form and manner that is reasonably calculated to reach all residents in the Affected and Potentially Affected Areas, based on consultation with the third-party organizations.

D. Test Results and Offer for Alternative Water

Within seven days of receiving any test result from the laboratory, Defendants shall provide the validated laboratory result to the associated residence and to EPA for each well that Defendants sampled, with a notice that explains the results and the health impacts of nitrate in drinking water. For residences where nitrate concentrations exceed 10 mg/L, Defendants shall include with the results an unconditional offer to provide alternative water, as specified in Section 1.E.

E. Provision of Alternative Water

Within 30 days of providing any validated laboratory result to a residence, Defendants shall supply and offer to install a reverse-osmosis filtration system ("RO filter") certified by an accredited third-party certification body to treat nitrate, to each residence where nitrate concentrations exceed 10 mg/L and the residence accepted Defendants' offer for alternative water.

Within three days of receiving an acceptance from a residence in response to Defendants' offer for alternative water, Defendants shall supply to the residence at

least one gallon of bottled water per person, per day, until an RO filter is supplied and installed to the residence by Defendants.

For each residence where nitrate levels exceed the capacity of the RO filter to reduce nitrate levels to 10 mg/L or below, as determined by the nitrate-reduction rate specified for the RO filter, Defendants shall provide to the residence at least one gallon of bottled water per person, per day. Bottled water shall likewise be provided to each residence where nitrate concentrations exceed 10 mg/L but installation of an RO filter is not feasible.

Within 30 days of providing the validated laboratory results to the residence, for each residence where nitrate concentrations exceed 10 mg/L and the resident has not responded to Defendants' offer for alternative water, a representative of at least one of the third-party organizations that meets the requirements of Paragraph 1.A.ii(b) shall visit the residence, repeat the test results for that residence, explain potential health impacts related to nitrate contamination in drinking water, and repeat the offer for alternative water.

Within 45 days of providing the validated laboratory results to the residents, Defendants shall provide to EPA contact information for any residences that have refused alternative water or have not responded to Defendants' good-faith efforts to contact the residence.

//

F. Testing and Maintenance of RO Filters

Defendants shall test and maintain RO filters at all residences in the Affected and Potentially Affected Area, including RO filters installed under this Preliminary Injunction and RO filters previously installed at such residences, until the Court terminates this Preliminary Injunction. Within 60 days of EPA's approval of the 2024 Residential Well QAPP and annually thereafter until the Court terminates this Preliminary Injunction, a representative of at least one of the third-party organizations that meets the requirements of Paragraph 1.A.ii(b) shall offer to collect from each residence with an RO filter in the Affected and Potentially Affected Areas, consistent with Paragraph 1.C., a sample of untreated water before it enters the RO filter and a sample of treated water after leaving the system to measure the efficacy of the RO filter. Within seven days of receiving test results from the laboratory, Defendants shall provide validated laboratory results to the residence and to EPA, with a notice that explains the results and the health impacts of nitrate in drinking water. For residences where the RO filter is failing to reduce nitrate concentrations below 10 mg/L, Defendants shall offer to replace the ineffective RO filter with a new RO filter or to provide bottled water in the circumstances specified under Paragraph 1.E. For those residences where RO filters are effective at reducing nitrate concentrations below 10 mg/L, Defendants shall offer professional maintenance service for the RO filters. For those

residences that accept Defendants' offer to provide professional maintenance service for the RO filters, Defendants shall provide such service until the Court terminates this Preliminary Injunction.

G. Continued Testing

For residences without an RO filter where any validated test result indicates that nitrate concentrations are between 5 mg/L and 10 mg/L, Defendants shall offer to conduct quarterly testing of the residential wells until the Court terminates this Preliminary Injunction, using the procedures specified in Sections 1.B-D of this Preliminary Injunction. After three years of quarterly testing, for residences where no quarterly test result exceeds 10 mg/L, Defendants shall offer to conduct annual testing. For the duration of this Preliminary Injunction, if a resident located within the boundaries of the Affected or Potentially Affected Areas makes a request to Defendants or to EPA for testing, then Defendants shall test the drinking water in accordance with Paragraphs 1.C. and 1.D. or, for a residence with an RO filter, in accordance with Paragraph 1.F.

H. Completion Report

Within 120 days of EPA's approval of the 2024 Residential Well QAPP, Defendants shall submit a report to EPA documenting efforts made by Defendants, including identifying those residences contacted by Defendants, the results of testing, and whether the residence received an RO filter or bottled water, already

had a treatment system, did not respond to the offer, or rejected the offer ("Completion Report"). The Completion Report shall include copies of the communications that Defendants provided to residences throughout the implementation of the 2024 Residential Well QAPP regarding testing, offers of alternative water, and the health impacts of nitrate in drinking water.

I. Annual Residential Well Report

Within 1 year and 30 days of entry of this Preliminary Injunction and annually thereafter until termination, Defendants shall provide to EPA an annual summary of: (1) all residential well testing and the results; (2) all residences where Defendants provided and/or maintained RO filters; and (3) all residences for which Defendants provided an alternative water supply in the Affected and Potentially Affected Areas ("Annual Residential Well Report").

J. Personally Identifiable Information

Defendants shall keep confidential all residents' personally identifiable information acquired pursuant to this Preliminary Injunction and shall share it only with contractors, as needed, and with EPA.

**2. Continued Groundwater Monitoring**

The subset of Defendants subject to the 2013 Consent Order, including Cow Palace, LLC; D and J Dairy, L.L.C. (f/k/a D and A Dairy, L.L.C.); George DeRuyter and Son Dairy, L.L.C.; George & Margaret, L.L.C.; Liberty Dairy, LLC;

and its associated Dairy Facility H&S Bosma Dairy (collectively, "the Dairies"), shall immediately re-commence quarterly monitoring of groundwater monitoring wells installed under the 2013 Consent Order, as required below.

A. Quality Assurance Project Plan

Within 30 days of entry of this Preliminary Injunction, the Dairies shall submit to EPA for review and approval a Groundwater Monitoring Quality Assurance Project Plan ("2024 Groundwater Monitoring QAPP") providing for quarterly groundwater monitoring of nitrate in addition to the following field parameters: dissolved oxygen; specific conductance; pH; temperature; turbidity; oxidation-reduction potential; total organic carbon data; nitrite; ammonia; and Total Kjeldahl Nitrogen ("TKN"). The 2024 Groundwater Monitoring QAPP shall otherwise remain consistent with the procedures required under the March 2018 Groundwater Monitoring Quality Assurance Project Plan submitted under the 2013 Consent Order. *See* Winiecki Decl., Ex. D.

B. Groundwater Monitoring and Reporting

The Dairies shall conduct quarterly groundwater monitoring from the existing groundwater monitoring network, in accordance with the 2024 Groundwater Monitoring QAPP, immediately upon EPA approval of the 2024 Groundwater Monitoring QAPP. Until the Court terminates this Preliminary

Injunction, the Dairies shall provide to EPA a quarterly summary of groundwater monitoring results ("Quarterly Groundwater Monitoring Report").

3. **Testing of Cow Palace Lagoon 1**

Defendants Cow Palace, LLC; the Dolsen Companies; and Three D Properties, LLC (collectively, "Cow Palace") shall immediately test Cow Palace Lagoon 1 to determine if the liner system at Lagoon 1 is leaking to the underlying soil.

A. Leak Test Plan

Within 21 days of entry of this Preliminary Injunction, Cow Palace shall submit to EPA for review and approval a plan to test for leakage from the upper and lower liners of Lagoon 1 ("Leak Test Plan"). The Leak Test Plan shall use appropriate methods under the American Society for Testing and Materials ("ASTM") standards referenced in the ASTM Standard Guide for Selection of Techniques for Electrical Leak Location of Leaks in Geomembranes ("ASTM Designation D6747-21"). If the upper liner must be removed to test the lower liner, re-installation of the upper liner must use methods outlined in the Cow Palace Dairy Facility Installation Quality Assurance and Quality Control Manual, Lagoon 1 (April 18, 2018).

//

//

B. Testing

Cow Palace shall commence testing of the liner system at Lagoon 1 within 30 days of EPA's approval of the Leak Test Plan. Cow Palace shall complete testing within 60 days of EPA's approval of the Leak Test Plan.

C. Interim Storage of Lagoon Content

If the appropriate ASTM method requires that Cow Palace empty Lagoon 1 and clear any accumulated manure deposits before testing, liquid removed from Lagoon 1 shall be temporarily stored in a lagoon compliant with the Natural Resources Conservation Service Practice Standard 313 – Waste Storage Facility ("WA NRCS 313"). If existing lagoons do not have capacity to store the contents of Lagoon 1, Cow Palace shall transport the remaining contents of Lagoon 1 for treatment or application outside of the Lower Yakima Valley Groundwater Management Area[1] and provide transport documentation to EPA, including the date and volume and name, contact information, and location of the transporting and receiving facilities.

//

//

[1] As defined on the Washington State Department of Ecology's website, available at https://ecology.wa.gov/issues-and-local-projects/environmental-projects/lower-yakima-valley-groundwater-management-area.

D. Completion Report

Within 30 days of completing testing for leakage at Lagoon 1, Cow Palace shall submit a Leak Test Completion Report to EPA. The Leak Test Completion Report shall document Cow Palace's activities implementing the Leak Test Plan, document with photographs the condition of each liner at the time of testing and provide the results of testing.

E. Action to Repair Leak

If a leak is detected from the upper or lower liners of Lagoon 1, Cow Palace shall take immediate action to repair the leak. Within 21 days of submitting the Leak Test Completion Report, Cow Palace shall submit to EPA for review and approval a Liner Repair Plan specifying repair procedures consistent with those obtained from the manufacturer and to be performed in accordance with the manufacturer's specifications. Cow Palace shall implement the Liner Repair Plan within 30 days of EPA approval.

The District Court Executive is directed to enter this Order and furnish copies to counsel.

**DATED** December 17, 2024.

THOMAS O. RICE
United States District Judge